# In The United States Court of Federal Claims

06-833C

## Cover Sheet

Plaintiff(s) or Petitioner(s)
Yates International, L.L.C.

If this is a multi-plaintiff case, pursuant to RCFC 20(a), please attach an alphabetized, numbered list of all plaintiffs.

Name of the attorney of record (See RCFC 83.1(c)): Robert E. Korroch

Firm Name: Williams Mullen

Post Office Box:

Street Address: Fountain Plaza Three, Suite 200
721 Lakefront Commons

City-State-Zip: Newport News, Virginia 23606

Telephone & Facsimile Numbers: 757.249.7105 (phone); 757.249.5109 (fax)

Is the attorney of record admitted to the Court of Federal Claims Bar? ☒ Yes ☐ No

Does the attorney of record have a Court of Federal Claims ECF account? ☒ Yes ☐ No
If not admitted to the court or enrolled in the court's ECF system, please call (202) 357-6406 for admission papers and/or enrollment instructions.

Nature of Suit Code: 1 1 4
Select only one (three digit) nature-of-suit code from the attached sheet. If 213, identify partnership or partnership group. If numbers 118, 134, 226, 312, 356, or 528 are used, please explain.

Agency Identification Code: D O D
See attached sheet for three-digit codes.

Amount Claimed: $ 818,192.00
Use estimate if specific amount is not pleaded.

Disclosure Statement:
Is a RCFC 7.1 Disclosure Statement required? ☒ Yes ☐ No
If yes, please note that two copies are necessary.

Bid Protest:
Indicate approximate dollar amount of procurement at issue: $
Is plaintiff a small business? ☐ Yes ☐ No

Vaccine Case:
Date of Vaccination:

Related Cases:
Is this case directly related to any pending or previous case? ☒ Yes ☐ No
If yes, you are required to file a separate notice of directly related case(s). See RCFC 40.2.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

YATES INTERNATIONAL, L.L.C.

Plaintiff,

v

UNITED STATES OF AMERICA,

Defendant.

06-833 C

COFC No. 06- -C

RECEIVED
DEC 7 2006
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

## COMPLAINT

NOW COMES Yates International, L.L.C. ("Yates International" or "Contractor"), by and through its undersigned attorney, and for its Complaint alleges as follows:

## INTRODUCTORY STATEMENT

1. Yates International seeks to appeal the contracting officer's ("CO's") deemed denial of Yates International's request for equitable adjustment ("REA") dated August 3, 2006, arising under contracts SP0450-03-D-1411 (the "Refurbishment Contract") and SP0450-03-D-4141 (the "Refill Contract") (referred to collectively as "the Contracts") awarded to Yates International by the Department of Defense ("DOD")/Defense Logistics Agency ("DLA"). A copy of Yates International's REA and its supporting documentation is attached herewith as Exhibits A and B.

2. Yates International also has instituted two additional actions against DLA in this Court: (1) Docket No. 06-157C, related to the DLA's wrongful termination for default of the Contracts; and (2) Docket No. 06-570C, related to DLA's assessment of reprocurement costs. The two actions have been consolidated under Docket No. 06-157C.

## PARTIES

3. Yates International is a corporation formed under the laws of the Commonwealth of Virginia.

4. Defendant is the United States of America, acting through its executive agency, DOD/DLA.

## JURISDICTION

5. The CO received Yates International's REA on August 4, 2006. See Exhibit C. As of October 3, 2006, sixty (60) days has passed without the CO having taken any action or notifying Yates International of the time within which a decision will be issued. The CO's failure to issue a decision on the REA within sixty (60) days without notifying Yates International of the time within which a decision will be issued constitutes a decision by the CO denying the claim and authorizes the commencement of this action. See 41 U.S.C. § § 605(c)(2)(B) & (c)(5). Therefore, jurisdiction is appropriate in this Court pursuant to 41 U.S.C. § 609(a)(1) and 28 U.S.C. § § 1491(a)(1) & (2).

## STATEMENT OF FACTS

6. In September 2003, DOD/DLA awarded Yates International two contracts. The first was the Compressed Gas Cylinder Refurbishment Contract ("Refurbishment Contract") and the second was the Compressed Gas Cylinder Refill and Delivery Contract ("Refill Contract") (collectively the "Contracts").

7. Through the Contracts, DOD/DLA, through its subordinate units, the Defense Supply Center Richmond ("DSCR") and Defense Logistics Agency-Europe, sought to utilize the

benefits of a centralized compressed gas cylinder program for its industrial gas customers in Europe.

8. Both of the Contracts contain the Government Delay of Work clause, FAR 52.242-17, and the Changes clause, FAR 52.243-1.

**The Refurbishment Contract**

9. The Refurbishment Contract, Contract No. SP0450-03-D-1411, is a one-year, fixed-price, requirements contract for the removal and refurbishment of 11,101 medical oxygen cylinders located at the U.S. Army Medical Material Center Europe in Pirmasens, Germany.

10. The Refurbishment Contract was awarded to Yates International on September 16, 2003. The total estimated price of the Refurbishment Contract was $384,000.

11. Under the Refurbishment Contract, 500 of the 11,101 cylinders, which were still full of medical oxygen, were to be repainted and relabeled only, while the remaining cylinders were to be vented and completely refurbished so that they could be used to hold other gases.

12. Yates International would transport the 11,101 cylinders to its Holland facility for refurbishment, which included inspection, venting, sand blasting, cleaning, hydrostatic testing, painting and labeling.

13. According to the Refurbishment Contract, Yates International was allowed 15 days from the date of the basic contract to take possession of all 11,101 cylinders and store them on contractor property in a secure location.

14. The first delivery order was to provide Yates International with a 60-day ramp-up period to allow for acquisition and/or setup of equipment.

15. Approximately 1,200 of the refurbished cylinders were to be delivered to the Defense Distribution Depot Europe at Germersheim, Germany, while the remaining refurbished cylinders were to be delivered to a final location to be determined at a later date.

A. Cylinder Caps:

16. The protective cylinder caps on all of the 11,101 government-furnished compressed gas cylinders experienced significant rusting while being stored outside, exposed to the elements, at the U.S. Army Medical Material Center Europe in Pirmasens, Germany.

17. This rusting occurred prior to the award of the Refurbishment Contract to Yates International, and resulted from DOD/DLA's failure to follow proper procedures, contained in DOD Instruction 4145.19-R-2, for the preparation and storage of compressed gas cylinders.

18. During the pre-bid process, Yates International specifically requested, but was denied, as were all potential bidders, access to the storage site at Pirmasens, Germany in order to conduct a pre-bid inspection of the cylinders.

19. In lieu of an on-site inspection of the cylinders during the pre-bid process, DOD/DLA provided Yates International with photos of the cylinder storage site. However, due to poor photo resolution and the distance from which the photos were taken, it was impossible to detect the rusting of the cylinder caps from the DOD/DLA-provided photo.

20. Yates International requested, but was denied, a pre-bid meeting with DOD/DLA to discuss, among other things, the condition of the cylinders, including the cylinder caps.

21. Yates International did not know, and had no reason to know, that all 11,101 valve caps were rusted onto the cylinders.

22. The rusting of the cylinder caps caused Yates International to expend additional time and resources to remove the caps before refurbishment could begin. Since the rusted cylinder caps could not be removed by hand, the normal method, and since the cylinders were still full of oxygen, special non-sparking tools were required to remove the caps.

23. During a pre-bid phone conversation, the CO told Yates International to "just bid the contract" and that if the rusted caps became an issue, it would be addressed after contract award.

24. Subsequently, after contract award, the CO confirmed this in an October 17, 2003 e-mail when he instructed Yates International to begin refurbishment of the cylinders, notwithstanding the rust problem. At that time, the CO also stated that he would "take care of the rust [issue]" upon the cylinders' arrival at Yates International's Holland facility.

25. On December 20, 2004, Yates International submitted a claim for equitable adjustment for the costs associated with removing the rusted caps in the amount of $91,296.

26. In response to Yates International's claim, on February 7, 2005, DOD/DLA authorized reimbursement to Yates International in the amount of $42,921, but failed to grant Yates International an appropriate extension of performance time.

27. In partially compensating Yates International for the costs incurred in removing the rusted cylinder caps, DOD/DLA stated that "[t]he Government does accept your contention that the 11,000 cylinders . . . were not properly preserved for long-term storage" at Pirmasens, Germany.

B. Progress Payments:

28. The Refurbishment Contract required DOD/DLA to pay Yates International progress payments of two months of the estimated contract value in the first delivery order. Two months of the Refurbishment Contract's estimated value was $64,000 (($384,000 ÷ 12) x 2)).

29. The progress payments were not to exceed the total value of all delivery orders issued.

30. Because Yates International is a small business with limited resources, receipt of the progress payments was essential to meet start-up costs at its Holland facility. DOD/DLA was informed of the importance of the progress payments to Yates International during pre-bid meetings.

31. DOD/DLA issued delivery order 0001 for 2,150 cylinders under the Refurbishment Contract on September 23, 2003. The estimated value of delivery order 0001 was $86,000.

32. On September 24, 2003, DOD/DLA modified the Refurbishment Contract to add progress payments to delivery order 0001 in the amount of $64,000.

33. On October 18, 2003, Yates International submitted a request for progress payment in the amount of $57,600, based on incurred costs of $64,000.

34. On October 23, 2003, Yates International submitted a request for a second progress payment in the amount of $19,800, based on total incurred costs of $86,000. The combined amount of Yates International's requests for progress payment was $77,400 ($64,000 + $19,800).

35. To date, Yates International has not received any progress payments as required by the Refurbishment Contract.

36. Due to the absolute necessity of progress payments to Yates International's ability to perform the Refurbishment Contract, Yates International would not have bid on either the Refurbishment Contract or Refill Contract if the progress payment provision had not been included.

37. DOD/DLA's improper withholding of progress payments caused Yates International to suffer significant cash flow problems and supply chain disruptions.

38. DOD/DLA's improper withholding of progress payments also caused Yates International to obtain replacement funds from a commercial bank as a loan.

39. DOD/DLA's failure to make timely progress payments caused Yates International to incur finance charges on loans that it borrowed specifically to finance costs that resulted from government delays.

40. DOD/DLA's failure to make timely progress payments caused Yates International to be unable to timely pay its suppliers and subcontractors, who refused to perform without payment, resulting in delay of Yates International's performance of the contract.

41. The Contract included the prompt payment clause at FAR 52.232-25. The government's failure to pay the progress payments violated the Contract's prompt payment clause.

C. Hydrostatic Testing:

42. At the start of the Refurbishment Contract, all of the 11,101 medical oxygen cylinders, including those to be converted to "technical grade oxygen," had expired hydrostatic test dates.

43. It is a violation of European Union ("EU") law to transport compressed gas cylinders with expired hydrostatic test dates on EU roads.

44. The Refurbishment Contract required Yates International to repaint 500 cylinders filled with medical oxygen, re-label them as "technical grade oxygen," and then transport them to DOD/DLA customers in Germany.

45. Although Yates International obtained an exemption to transport DOT certified cylinders on EU roads without separate Dutch certification, DOT/Dutch certifications and exemptions are completely distinct from the issue of expired hydrostatic test dates.

46. In October 2003, Yates International informed DOD/DLA that the 500 cylinders to be converted to "technical grade oxygen" had to be vented and hydrostatically tested to meet EU transportation regulations. These cylinders could not just be repainted, relabeled, and transported on EU roads with expired hydrostatic test dates. DOD/DLA disagreed and insisted that the 500 cylinders should just be repainted and relabeled.

47. On June 15, 2004, DOD/DLA changed its position and stated that it concurred with Yates International's recommendation that the 500 cylinders should be vented, hydrostatically tested, and refurbished instead of just being repainted and re-labeled.

48. Yates International was required to bring the 500 cylinders to be converted to "technical grade oxygen" with expired hydrostatic test dates into EU regulatory compliance.

D. Suspension of Work and Change in Scope:

49. On December 1, 2003, DSCR instructed Yates International to suspend operations on the Refurbishment Contract in order to fill 20 orders, totaling more than 100 compressed gas cylinders, which were being shipped to Yates International's Holland facility. These cylinders, once filled, were to be given to U.S. Army troops scheduled to deploy to Iraq.

50. This unanticipated requirement, accompanied by a DSCR imposed deadline, caused Yates International to redirect all of its resources from the Refurbishment Contract to the cylinders for the deploying U.S. Army troops.

E. Environmental Compliance:

51. In addition to the 500 medical oxygen cylinders discussed above, Yates International was required to bring 10,601 (non-"technical grade oxygen") cylinders into compliance with EU laws. This included the use of special venting procedures because, under EU law, compressed gas (including compressed oxygen) may not simply be vented into the atmosphere. Yates, which did not know or have reason to know that the government's cylinders had expired hydrostatic test dates, reasonably relied on the assumption that DOD/DLA would only supply cylinders that met the more stringent EU environmental laws.

F. Termination:

52. Despite the failures of the government to comply with the requirements of the Refurbishment Contract and cooperate in performance, Yates International successfully performed the Contract.

53. Under the Refurbishment Contract, Yates International refurbished approximately 9,046 compressed gas cylinders.

54. On March 3, 2005, DSCR unilaterally terminated the Refurbishment Contract for default "for not making delivery of the contract." This termination lacked any basis.

**The Refill Contract**

55. The Refill Contract, Contract No. SP0450-03-D-4141, is a one-year, fixed-price, requirements contract, with nine one-year option periods, for the refill, storage and delivery of filled compressed gas cylinders to selected DOD/DLA customers in Germany.

56. The Refill Contract was awarded to Yates International on September 30, 2003. The total estimated price of the Refill Contract in the base year was $564,802. Yates International was awarded an option for a second year on August 30, 2004.

57. Under the Refill Contract, the 11,101 compressed gas cylinders refurbished under the Refurbishment Contract were to be filled with various gases and then delivered to requesting DOD/DLA customers within three days of receipt of an order.

58. In conjunction with delivering full cylinders to DOD/DLA customers, Yates International would pick up used cylinders, perform maintenance on the empty cylinders and dispose of unserviceable cylinders.

59. Yates International was also required to maintain a rotating pool of various types of filled cylinders at its Holland facility for distribution to DOD/DLA customers in Germany.

60. Yates International was given 90 days to ramp-up to be able to fully support the Refill Contract.

61. The Refill Contract included a list of locations in Germany where filled cylinders were to be delivered.

62. Prior to and after execution of the Refill Contract, the CO told Yates International that the Refill Contract "was the same as the National Welders contract." Under the National Welders contract, an earlier DOD/DLA contract under which Yates International was a subcontractor, the minimum delivery order quantity was one truckload of cylinders.

63. Delivery time for orders placed by DOD/DLA customers was three days for in-stock cylinders (i.e., in the Contractor's pool) and 30 days for out-of-stock cylinders.

A. Pallets:

64. Under the Refill Contract, Yates International was required to fill and then transport the filled compressed gas cylinders via ground transportation to various DOD/DLA customers throughout Germany.

65. The Refill Contract states that "[a]ll U.S. Government furnished pallets, bins . . . used to transport the empty cylinders to the Contractor's fill plant shall be reused to transport the full cylinders to their destination."

66. The Refill Contract further states that "[t]he transportation of full and empty cylinders in U.S. Government or Contractor owned steel bins, baskets, pallets, or other similar devices is authorized provided such means of transportation meets or exceeds all DOT *and European country regulations*."

67. Based on the above provisions of the Refill Contract, pallets furnished by the U.S. Government were required to meet or exceed EU ground transportation requirements.

68. At the Defense Distribution Depot Europe at Germersheim, Germany, the cylinders were initially made available to Yates International on U.S. Government-furnished wooden pallets that did not meet EU ground transportation requirements.

69. EU regulations, which are more stringent than DOD/DLA regulations, mandate that compressed gas cylinders transported on EU roads, including roads in Germany and Holland, must be loaded vertically on 3- or 4-sided steel pallets known as "T-Carts."

70. Ramstein Air Base ("Ramstein"), the major U.S. military air transportation hub in Germany, would not accept cylinders on wooden pallets for transportation onboard U.S. military aircraft.

71. In a February 27, 2004 "Memorandum For Record" of a February 20, 2004 meeting with Yates International, DSCR acknowledged Ramstein's prohibition on wooden pallets, stating that it agreed to "look at modifying the requirements for T-carts, to be able to . . . meet Ramstien's [sic] . . . requirements."

72. Yates International notified the CO of the pallet/T-Cart issue on or before September 18, 2003, which was before the Refill Contract was awarded.

73. In an October 7, 2003 e-mail, the CO acknowledged the pallet/T-Cart issue to Yates International, stating "about the new T-car [sic] style, just hold on for a while. We are undergoing management changes and a physical location move soon!"

74. Subsequently, DOD/DLA authorized Yates International to research and design T-Carts that would meet EU roadway transportation regulations.

75. Shipment of filled compressed gas cylinders under the Refill Contract could not begin until T-Carts meeting EU requirements were received by Yates International.

76. On December 3, 2003, DOD/DLA modified the Refill Contract to purchase 200 T-Carts, which were to be delivered to Yates International's Holland facility. On December 4,

2003, the CO sent a fax to Yates International stating that DOD/DLA would buy 200 T-Carts so that Yates International could begin shipping filled cylinders "next week" (mid-December 2003).

77. The failure of DOD/DLA to initially provide, or later approve and procure in a timely manner, compressed gas cylinder pallets/T-Carts that met or exceeded EU requirements caused Yates International to be significantly delayed before it could begin shipping filled cylinders on EU roads.

B. Cylinder Documentation:

78. Yates International was required to comply with both U.S./DOD/DLA *and* EU regulations, which are typically more stringent than U.S./DOD/DLA regulations.

79. EU regulations require production and verification of a cylinder's documentation, which includes date of manufacture, testing history, etc., before that cylinder can be filled with compressed gas.

80. DOD/DLA did not have documentation for any of the 11,101 cylinders.

81. Due to DOD/DLA's failure to provide cylinder documentation, Yates International was required to expend time and resources to obtain it directly from the cylinder manufacturers.

82. Yates International, under EU regulations, could not begin filling any of the 11,101 cylinders until it obtained the cylinder documentation.

C. Quantity and Type of Cylinders:

83. Due to safety concerns (e.g. the possibility of explosion), the type of gas that a previously-filled compressed gas cylinder can hold is restricted. Further, because more gas can

be placed into cylinders with higher pressure ratings, orders for larger volumes of gas require cylinders rated at a higher pounds-per-square inch ("PSI") level.

84. Notwithstanding these safety concerns, DOD/DLA repeatedly directed Yates International to fill some of the medical oxygen cylinders with gases, including hydrogen, which could have resulted in an explosion.

85. Notwithstanding these safety concerns, DOD/DLA repeatedly directed Yates International to fill some of the 2015-PSI cylinders with volumes of gas that exceeded their PSI rating.

86. Because there were no suitable cylinders among the 11,101 Refurbishment Contract cylinders, orders for "I-valve" carbon dioxide ("CO2"), acetylene, and 2400-PSI oxygen were to be filled in cylinders provided by DOD/DLA. However, DOD/DLA failed to provide cylinders in time for Yates International to meet numerous orders for "I-valve" CO2, acetylene, and 2400-PSI oxygen.

87. Yates International could not process numerous orders under the Refill Contract because of safety concerns and non-availability of DOD/DLA supplied cylinders.

D. <u>Freight Costs</u>

88. According to the solicitation for the Refill Contract, "[t]he successful vendor will be required to deliver cylinders to all units in Germany, on an FOB destination basis, within 3 days after receipt of an order." The Solicitation further states "[t]he successful vendor will also be required to deliver filled cylinders to Germersheim (DDDE) and other locations in Germany in support of Military and/or federal industrial gas requirements for other parts of Europe. The

successful vendor shall deliver filled cylinders to Germersheim, on an FOB destination basis, within 30 days after receipt of order [sic]."

89. When Yates International submitted its bid for the Refill Contract, it was told by the Government that freight would be reimbursed at a flat rate of $2,000 per delivery. In reliance on the Government's statement, Yates created its operating budget, which included a freight schedule based on the $2,000 flat rate reimbursement.

90. The solicitation for the Refill Contract was not amended to change the terms from FOB Destination to FOB Origin.

91. Block 8 ("Delivery") of the Refill Contract Award shows that the box for "FOB Origin" is checked. See Exhibit 4, Tab 29, at 1. However, the Block 8 box for "Other" (e.g., FOB Destination) also appears to have been checked and then scribbled out.

92. In January 2004, DOD/DLA informed Yates that freight reimbursement would occur on an "actual expense" basis. DOD/DLA confirmed this interpretation in a May 24, 2004 letter, stating:

> On an FOB destination contract, the vendor is required to ship goods to a specific destination and the freight charge is part of the vendor's unit price. In an FOB origin contract, at the time of award, although the exact destination is unknown, the vendor is still responsible for proper and prompt delivery and the vendor is reimbursed for exact freight charges. *Your freight schedule cannot be incorporated into the contract because an FOB origin contract denotes that shipping charges are reimbursable.*

Exhibit A, Tab 39 (emphasis added).

93. DOD/DLA has provided no explanation or justification for changing the FOB requirement from "Destination" in the Solicitation to "Origin" in the Contract Award.

E. Estimated Quantities

94. The solicitation states that "estimated number of cylinders required, annually" was between 4,750 and 5,179.

95. Further, a Refill Contract Award spreadsheet estimates that 4,402 cylinders will be filled per year.

96. The government provided Yates International only 280 cylinders that were ready to refill during the first year of Yates International's performance of the contract.

F. Termination

97. Despite the failures of the government to comply with the requirements of the Contracts and cooperate in performance, Yates successfully performed as much of the Refill Contract as was possible under the circumstances.

98. During the second (first option) year of the Refill Contract, Yates International refilled 3,949 compressed gas cylinders.

99. On March 3, 2005, DSCR unilaterally terminated the Refill Contract for default because of Yates International's "not making delivery of the contract." This termination lacked any basis.

**Decline in Value of Dollar**

100. Yates International sought an opportunity to bid the Contracts in Euros instead of U.S. dollars.

101. The CO refused to address the currency issue with Yates International until after award of the Contracts.

102. Yates International believed that it would be given a fair opportunity to address its concerns with the CO and that the Contracts would protect it from unprecedented fluctuations in currency valuation.

103. Many times during 2003, the government, through President George W. Bush and U.S. Treasury Secretary John Snow, stated that the U.S. government had a "strong dollar policy."

104. In preparing its proposals for the Contracts, Yates International relied on the U.S. government's pronouncements about its monetary policy and the CO's statements that he would be willing to address the issue after award.

105. During the course of Yates International's performance of the Contracts, the value of the U.S. dollar experienced an unprecedented decline in value against the Euro.

106. Despite earlier statements by high-ranking government officials, the government allowed the U.S. dollar to decline in value relative to the Euro.

107. After award of the Contracts, Yates International repeatedly requested that the government modify the Contracts to address the currency fluctuation issue, but the CO refused to meet with Yates International to discuss this.

108. The government refused to respond to Yates International's suggestion that the Contracts be modified to protect both parties from unforeseen currency fluctuations.

**Requests for Equitable Adjustment**

109. On December 20, 2004, Yates International submitted a "Claim for Equitable Adjustment" for the Refurbishment Contract ("First Claim"). See Exhibit A, Tab 1. In response, on February 7, 2005, DOD/DLA partially reimbursed Yates International in the amount of $42,921 because the cylinders "were not properly preserved for long-term storage by [DOD/DLA

personnel]." See Exhibit A, Tab 2. However, DOD/DLA denied the remainder of Yates International's first claim, stating:

> Your remaining claims failed to prove that Yates International was harmed by Government action or inaction. *These claims do not state a legal basis by which the government can authorize relief under federal procurement law.* The government can only authorize monies spent where a legal basis for entitlement exists.

Exhibit A, Tab 2 (emphasis added).

110. The contacting officer did not issue a final decision on Yates International's First Claim.

111. On December 20, 2004, Yates International submitted a "Claim for Equitable Adjustment" for the Refill Contract ("Second Claim"). See Exhibit A, Tab 3. On January 13, 2005, Yates International submitted additional justification for its claim in response to a January 11, 2005 telephone call with DLA/Defense Supply Center Richmond ("DSCR") representatives. See Exhibit A, Tab 4. In response, on February 7, 2005, DOD/DLA denied Yates International's "claim," stating:

> Your claim failed to prove that Yates International was harmed by Government action or inaction. *To support legal entitlement to relief, your claims must establish government caused changes beyond the scope of [the Refill Contract].* Your equitable adjustment claim instead involves background business expenses and risks DSCR had no direct role in changing.

Exhibit A, Tab 5 (emphasis added).

112. The CO did not issue a final decision on Yates International's Second Claim.

113. On August 3, 2006, by counsel, Yates International submitted a certified REA in the amount of $818,192.00 under the Refurbishment and Refill Contracts (the "2006 REA") to DOD/DLA CO Edward G. West. See Exhibit A.

114. In the 2006 REA, Yates International sought equitable adjustments under the Contracts' Government Delay of Work and Changes clauses and breach of contract damages. See Exhibit A.

115. On September 12, 2006, Yates International provided the CO with accounting worksheets in support of its REA. The CO never responded to this submission. See Exhibit B.

116. Yates International has not received a response from DOD/DLA to its 2006 REA.

**COUNT I**

**Adjustment for Delay**
**(Refurbishment Contract)**

117. Paragraphs 1 through 116 are realleged and incorporated by reference as if fully set forth herein.

118. The government delayed or interrupted Yates International's performance of the Refurbishment Contract by its failure to act within a reasonable time to rectify the obstruction presented by the government's provision of cylinders with rusted caps, by its failure to timely pay Yates International progress payments, by its failure to timely provide Yates International with cylinders with current hydrostatic test data, by its suspension of work to divert Yates International's efforts toward the refurbishment and refill of cylinders bound for Iraq, and by its failure to act to address the interruption caused by the failure of the government's cylinders to comply with EU environmental standards.

119. Yates International is entitled to an adjustment for the increase in the cost of performance of the Refurbishment Contract caused by government delay and an adjustment in the delivery dates affected by the delay.

**COUNT II**

**Equitable Adjustment for Changes**
**(Refurbishment Contract)**

120. Paragraphs 1 through 119 are realleged and incorporated by reference as if fully set forth herein.

121. Yates International was required to perform work beyond the contract requirements by order of the government or because of the fault of the government because of the government's failure to properly preserve government-furnished cylinders for long-term storage (resulting in rusted cylinder caps), failure to pay Yates International progress payments, provision of cylinders with expired hydrostatic test data, suspension of work and change in the scope of the contract, and requirement of Yates International to bring government cylinders into compliance with EU environmental standards.

122. Yates International is entitled to an equitable adjustment of the price of the Refurbishment Contract's price and delivery schedule.

**COUNT III**

**Adjustment for Delay**
**(Refill Contract)**

123. Paragraphs 1 through 122 are realleged and incorporated by reference as if fully set forth herein.

124. The government delayed or interrupted Yates International's performance of the Refill Contract by its failure to act within a reasonable time to provide Yates International with proper pallets for transporting cylinders, provide Yates International with proper documentation for government-furnished cylinders, and failure to furnish proper cylinders.

125. Yates International is entitled to an adjustment for the increase in the cost of its performance of the Refill Contract caused by government delay and an adjustment in the delivery date affected by the delay.

**COUNT IV**

**Equitable Adjustment for Changes (Refill Contract)**

126. Paragraphs 1 through 125 are realleged and incorporated by reference as if fully set forth herein.

127. Yates International was required to perform work beyond the contract requirements by order of the government or because of the fault of the government because of the government's failure to provide Yates International with proper pallets for transporting cylinders, failure to provide proper documentation for government-furnished cylinders, failure to furnish proper cylinders for refill, and change in the Refill Contract's freight expense term.

128. Yates International is entitled to an equitable adjustment of the Refill Contract's price and delivery schedule.

**COUNT V**

**Adjustment in the Contracts for Decline in the Value of the Dollar (Christian Doctrine)**

129. Paragraphs 1 through 128 are realleged and incorporated by reference as if fully set forth herein.

130. A price adjustment clause for changes in currency value should be read into the Contracts.

131. Yates International is entitled to an adjustment in the price of the Contracts under the price adjustment clause for the significant unexpected changes in cost because of changes in the exchange rate.

## COUNT VI

### Adjustment in the Contracts for Decline in the Value of the Dollar (Mutual Mistake)

132. Paragraphs 1 through 131 are realleged and incorporated by reference as if fully set forth herein.

133. When they formed the Contracts, both Yates International and the government were mistaken in their belief that Yates International would be protected from an unforeseen significant decline in the value of the dollar.

134. Their mistaken belief was a basic assumption on which the Contracts were made.

135. The mistake had a material effect on the bargain.

136. The parties did not intend to place the risk on Yates International of the decline in the value of the dollar.

137. The Contracts should be reformed to correct the mutual mistake of the parties at the time of contracting that the Contracts provided Yates International with protection against unforeseen fluctuations in currency value.

## COUNT VII

### (Breach of Contract) Government's Failure to Exercise Reasonable Care

138. Paragraphs 1 through 137 are realleged and incorporated by reference as if fully set forth herein.

139. The government breached the Refill Contract by failing to exercise reasonable care in developing the estimated quantities for the Refill Contract.

140. Yates International is entitled to award of damages for the government's breach of the Refill Contract.

## COUNT VIII

### Breach of Implied Duty of Good Faith and Fair Dealing

141. Paragraphs 1 through 140 re realleged and incorporated by reference as if fully set forth herein.

142. DOD/DLA' failure to disclose the condition of rusted cylinder caps, refusal to pay progress payments, insistence that Yates International transport cylinders in the EU with expired hydrostatic test dates, suspension of work and change in the scope of the contract, and termination of the Refurbishment Contract for default constituted a pattern of conduct that was in breach of the implied duty of good faith and fair dealing.

143. DOD/DLA's failure to disclose the condition of the pallets, failure to provide necessary documentation and misrepresentation of the type and quantity of cylinders that would be available for refill, and termination of the Refill Contract for default constituted a pattern of conduct that was in breach of the implied duty of good faith and fair dealing.

144. DOD/DLA's refusal to discuss with Yates International after award of the Contracts Yates International's desire to modify the Contracts to address concerns for the risk of devaluation of the U.S. dollar was in breach of the implied duty of good faith and fair dealing.

145. On or about March 23, 2005, in an email to an employee of Yates International, the CO threatened that if a shipment from Yates International was delayed, "gentlemen with suits and badges will be at the door."

146. The CO's threat, made fifteen (15) days after the Contracts were terminated for default, was a breach of the implied duty of good faith, fair dealing and cooperation, and reflects a government attitude that hindered the ability of Yates International to perform the Contracts and conduct business following the government's termination of the Contracts.

147. Yates International is entitled to award of damages for the government's breaches of its implied duty of good faith and fair dealing in the performance of the Contracts.

## PRAYER FOR RELIEF

WHEREFORE, Yates International respectfully requests judgment against the United States of America as follows:

A. Yates International is entitled to an adjustment in the contract price of $818,192.00 and damages as described in Exhibits A and B and a reasonable extension of time for its performance of the Contracts.

B. Yates International shall be awarded its costs already incurred and such costs as may be incurred on a continuing basis until Defendant fully complies with its contractual obligations;

C. Yates International shall be awarded interest and costs, including attorney fees, as permitted by law, together with such other and further relief as the Court deems just and appropriate.

Dated: December 6, 2006

Respectfully submitted,

Bob Korroch

Robert E. Korroch
Thomas O. Mason
Francis E. Purcell, Jr.
Williams Mullen, P.C.
Fountain Plaza Three, Suite 200
721 Lakefront Commons
Newport News, Virginia 23606
757.249.5100 (telephone)
757.249.5109 (facsimile)
Attorneys for Plaintiff

1150608v2